Filed 2/18/25  P. v. Johnson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C097212 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2020-0003641) |
| v. | |
| ARTHUR JOHNSON III, | |
| Defendant and Appellant. | |

Defendant Arthur Johnson III appeals from his conviction of gross vehicular manslaughter while intoxicated.  He contends (1) the racial makeup of his jury panel violated the constitutional fair cross-section requirement, and the trial court erred by denying his motion to dismiss the panel; (2) the trial court violated his constitutional right to the free exercise of religion when it refused to allow him, a minister, to wear his clerical collar during trial and have a Bible on the table where he sat; (3) the prosecutor committed misconduct by mischaracterizing a witness's testimony, and counsel rendered

1

ineffective assistance by not requesting an admonition to cure the error; (4) he did not receive adequate notice of his Three Strikes sentence; (5) the trial court erred by not striking his prior strikes as unlawful enhancements; and (6) the trial court erred in not considering whether the restitution award should be offset by payments from defendant's insurance.

We conclude defendant did not receive adequate notice of his eventual Three Strikes sentence, and we remand for a full resentencing. We affirm the judgment in all other respects.

FACTS AND HISTORY OF THE PROCEEDINGS

On March 29, 2020, at around 5:00 p.m., defendant drove a black BMW eastbound on Dr. Martin Luther King Junior Boulevard (MLK Boulevard), also known as Charter Way, in Stockton. The speed limit was 45 miles per hour, but law enforcement later estimated defendant reached speeds of 90 miles per hour. In one instance, defendant sped up behind a motorcycle, got within inches of its rear tire, and accelerated past it at approximately twice its speed. Another driver had to switch lanes twice because defendant was approaching so fast.

At the B Street intersection, defendant ran the red light. He collided with a car that was turning onto MLK Boulevard. Defendant's vehicle settled in bushes in the median up the road with severe front-end damage. The other car was "essentially split in half."

The driver of the other car, Mark Fultcher, was ejected from the vehicle onto the street. Fultcher remained conscious, but he had life-threatening injuries, could not speak, and could not move his lower extremities. As witnesses attended to Fultcher, defendant walked toward them, picked up a branch, and while swinging it around said, "That motherfucker better not come near me." Then he returned to his vehicle. Paramedics transported Fultcher to the hospital.

Police officers Jared Macias and Christian Barreto spoke with defendant, who remained in his damaged vehicle. Officer Macias asked him if he needed help, but he moved his arms around quickly and tried to get the officer to leave. Concerned for his safety, Officer Macias opened the car door and instructed defendant to get out of the vehicle. Defendant responded incoherently but did not comply. Ultimately, the officers removed him from the vehicle, placed him on the ground, and handcuffed him. His responses to questions from the officers were incoherent, rambling, and random. Defendant was bleeding from his head but did not appear to have life-threatening injuries. An ambulance took him to the hospital.

At the hospital, defendant had an elevated heart rate and low blood pressure, but his other vital signs were stable. His only identified injury was a laceration to his back left scalp. He was agitated, shouting, and combative. His blood test revealed the presence of methamphetamine, amphetamine, and marijuana. Physicians treated defendant for his head wound and discharged him to law enforcement. Defendant failed an eye Nystagmus field sobriety test conducted by Officer Macias at the hospital.

Fultcher was critically injured. The accident broke every rib on his left side, bruised his lungs, and fractured his pelvis and humerus bones. The broken ribs and bruised lungs caused blood to accumulate in his left chest. The lung injuries and a pneumonia he contracted made it difficult to oxygenate him. He was transferred to U.C. Davis to be placed on a heart/lung bypass machine. On April 7, 2020, Fultcher died from cardiac arrest caused by complications from his injuries.

A jury found defendant guilty of gross vehicular manslaughter while intoxicated. (Pen. Code, § 191.5, subd. (a) [statutory section citations that follow are to the Penal Code unless otherwise stated].) The jury found true allegations that defendant violated the basic speed law and failed to stop at a red light. (Veh. Code, §§ 22350, 21453.) In a bifurcated proceeding, the trial court found true allegations that defendant had two prior serious felony convictions. (§§ 1170.12, subd. (b); 667, subd. (a).)

3

At sentencing, the trial court denied defendant's *Romero* (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497) motion. It sentenced defendant to an indeterminate prison term of 25 years to life under the Three Strikes law, and it struck the two five-year prior serious felony enhancements alleged under section 667, subdivision (a).

DISCUSSION

I

*Motion to Dismiss Jury Panel*

Under the federal and state constitutions, a criminal defendant is entitled to a jury drawn from a reasonably representative and fair cross-section of the community. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *Duren v. Missouri* (1979) 439 U.S. 357, 358, 364-365 (*Duren*); *People v. Anderson* (2001) 25 Cal.4th 543, 566 (*Anderson*).) " 'That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community.' " (*Anderson*, at p. 566.)

On the first day of jury selection, defendant objected to the lack of African Americans in the jury pool, or panel. We note that "[f]or clarity we use the following terms to describe the stages in selection of jurors: The 'master list' is the compilation of eligible jurors. A 'venire' is the group of prospective jurors summoned from the master list. A 'panel' is the group of jurors from the venire assigned to a court for selection of the trial jury." (*People v. Breaux* (1991) 1 Cal.4th 281, 296, fn. 2 (*Breaux*).)

Defendant saw only two African Americans in the panel, and he requested a different jury panel. The trial court asked defendant to support his request with legal authority. The next day, defendant filed a written motion to dismiss the jury panel for lack of "cross-community representation." Defendant used the term "venire" in his motion, but it is apparent from his moving papers that he was referring to the jury panel. Based on his visual inspection, counsel asserted that only three of the remaining 78 potential jurors on his panel were African American. He argued the disparity between

4

that number and the number of African Americans in San Joaquin County violated the fair cross-section requirement. He also asked for a continuance to conduct discovery to further prove the issue. The trial court denied the motion. Defendant contends the court erred.

To establish a prima-facie violation of the fair cross-section requirement, "the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren, supra*, 439 U.S. at p. 364; *Anderson, supra*, 25 Cal.4th at p. 566.)

If the defendant establishes a prima facie case of systematic underrepresentation, " 'the burden shifts to the prosecution to provide either a more precise statistical showing that no constitutionally significant disparity exists or a compelling justification for the procedure that has resulted in the disparity in the jury venire.' " (*Anderson, supra*, 25 Cal.4th at p. 566.)

Defendant argues he satisfied the first two prongs of the *Duren* test. African Americans are a distinctive group within the community, and he showed the disparity between the number of African Americans remaining on his jury pool and the number of African Americans residing in San Joaquin County.

As for the third prong, defendant acknowledges that to establish a systematic exclusion to satisfy the third prong, California law requires that where the jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, "the defendant must identify some aspect of *the manner in which those criteria are applied* (the probable cause of the disparity) that is constitutionally impermissible." (*Anderson, supra*, 25 Cal.4th at pp. 566-567.) Defendant does not claim he satisfied the third prong. Rather, he claims we must reconsider that requirement in light of the California Racial

5

Justice Act (§ 745) and its provisions to eliminate racial disparities in the criminal justice system regardless of how they arise.

Defendant argues that even if we conclude the third prong of the *Duren* test survives adoption of the Racial Justice Act, the trial court abused its discretion and denied him due process and his right to counsel by denying him a continuance to conduct discovery to fully address the third prong. He claims his challenge to the actual makeup of his jury panel could not have been brought before he saw the pool of available jurors; thus, his request was not untimely and the court should have granted the continuance so he could receive the effective assistance of counsel. Defendant asserts these errors are reversible per se.

There is no dispute that defendant established the *Duren* test's first prong. African Americans are a distinctive group in the community. (*People v. Burgener* (2003) 29 Cal.4th 833, 859.)

But defendant falls short as to the second. His written motion to dismiss the panel asserted that out of the approximately 78 persons remaining on his jury panel, only three were African American, or approximately 3.8 percent. And he asserts recent census estimates indicated that 8.3 percent of the San Joaquin County population was African American. Defendant calculates that the absolute disparity between the expected number of Black jurors and the actual number of Black jurors remining on his panel at the time of his motion was 4.5 percent, and the comparative disparity was 118 percent. Defendant claims the latter disparity far exceeds comparative disparities found to be insignificant by the California Supreme Court.

Defendant incorrectly relies upon the number of jurors remaining on his panel to determine disparities. Under-representation on the particular panel or panels assigned to the court in which the defendant's jury is to be selected is not relevant to the inquiry. (*People v. Bell* (1989) 49 Cal.3d 502, 525; *People v. De Rosans* (1994) 27 Cal.App.4th 611, 618 (*De Rosans*).) Defendant "is not entitled to a panel that represents a cross-

6

section of the community.  Rather, he is entitled to a panel *drawn from* a representative cross-section of the community." (*De Rosans*, at p. 621.)

Defendant's burden under the second prong is to show that the representation of African Americans " '*in venires from which juries are selected* is not fair and reasonable in relation to the number of persons in the community[.]' " (*People v. Bell, supra*, 49 Cal.3d at p. 526, quoting *Duren, supra*, 439 U.S. at p. 364.)  "The second *Duren* prong requires a showing that the cognizable group is underrepresented in *venires* from which *juries* are selected, not on the panel from which the defendant's jury is selected." (*De Rosans, supra*, 27 Cal.App.4th at p. 621, fn. omitted.)

Evidence supporting the second prong of a fair cross-section claim "typically includes census data and studies of the composition of jury venires, usually over several months, in the judicial district in which the defendant is to be tried.  (See, e.g., *People v. Harris* [(1984)] 36 Cal.3d [36,] 46 [three-month survey of jury venires appearing at Long Beach courthouse]; *People v. Bell, supra,* 49 Cal.3d at p. 524 [six-month survey]; *People v. Breaux, supra,* 1 Cal.4th at p. 296 [four-and-a-half-month survey].)  In *People v. Morales* (1989) 48 Cal.3d 527, evidence of the number of Spanish-surnamed persons in two consecutive jury venires totaling [788] persons represented a sample 'too small in size, and too short in duration' to make a prima facie showing of underrepresentation. ([*Id.*] at pp. 542, 548.)" (*De Rosans, supra*, 27 Cal.App.4th at p. 619.)

Defendant presented no evidence concerning the composition of jury venires in the county over a sufficiently long period of time.  As a result, the trial court did not err in denying defendant's motion to dismiss the panel.  Because defendant did not establish the *Duren* test's second prong, we need not address his arguments under the third prong.

Defendant argues the trial court abused its discretion in not granting him a continuance.  He sought a continuance to obtain such detailed evidence as well as evidence to establish the third prong of the *Duren* test, systematic exclusion.  He asserts he could not have sought the continuance any earlier because the nature of challenging a

7

jury panel meant he could not have identified the underrepresentation until after he saw the actual panel. The delay a continuance would have entailed was thus unavoidable. Defendant claims that denying the continuance denied him the effective assistance of counsel.

We conclude the trial court did not abuse its discretion in denying the continuance. Defendant could have obtained the relevant evidence and filed his motion to dismiss the panel before trial commenced. The fair cross-section requirement as well as *Duren* "clearly contemplate[] a pre-trial challenge." (*De Rosans, supra*, 27 Cal.App.4th at p. 621.)

Defendant's argument "that the trial court should have granted a continuance rests on an erroneous assessment of the nature of a fair cross-section claim. He is not entitled to a panel that represents a cross-section of the community. Rather, he is entitled to a panel *drawn from* a representative cross-section of the community. Thus, a challenge to the jury panel is always necessarily a challenge not to the composition of the panel but to the procedure by which the panel is composed. . . . [¶] . . .[¶]

"The *Duren* elements of a prima facie showing of a fair cross-section violation are consistent with this understanding. The second *Duren* prong requires a showing that the cognizable group is underrepresented in *venires* from which *juries* are selected, not on the panel from which the defendant's jury is selected. The third *Duren* prong requires a showing that the system for selecting prospective jurors causes this underrepresentation; whether underrepresentation on the defendant's particular panel or panels resulted is incidental. The evidence required for the prima facie showing is therefore entirely available before voir dire begins." (*De Rosans, supra*, 27 Cal.App.4th at p. 621, fn. omitted.)

Defendant's trial counsel began representing him by September 30, 2021. The trial court heard in limine motions on March 29, 2022. Defendant filed his motion to dismiss the jury panel on April 8, 2022, after three panels had been called for his trial.

Defendant had adequate time before voir dire began to assemble the evidence necessary to support a motion to dismiss the panel. The trial court thus did not abuse its discretion in denying his request for a continuance.

## II

### *Wearing of Clerical Collar*

Defendant requested the trial court allow him to wear a clerical collar during trial and have a Bible with him because he is an ordained minister. The trial court denied defendant's request. Defendant contends the court unreasonably denied him his constitutional right to the free exercise of religion, and he asserts the error is reversible per se.

### A.     Background

Prior to opening statements, defense counsel asked the trial court to allow defendant to wear a clerical collar. Counsel stated that defendant was an ordained minister and asserted defendant had a right to wear the collar. Counsel did not further explain the "right." The prosecutor objected. She argued that wearing the collar would be prejudicial; it would put defendant "in a light that's not appropriate to this jury." Defendant had no right to "give symbolism of God in the middle of this jury trial."

The court noted that defendant at that time was wearing a collar. Counsel stated the collar was "a piece of toilet paper that he has on there." The court directed defendant to remove the collar and not to wear it unless counsel provided the court with authority.

Later that day, defense counsel produced a letter from the Christian Global Outreach Ministry. The letter stated defendant was a minister in good standing. The court stated it was still waiting for case authority before it would allow defendant to wear a collar. Counsel stated defendant also wanted to have a Bible with him during the trial. The court said, "no," for the same rationale.

9

The next day, defense counsel again asked the court to permit defendant to wear the collar. He offered no supporting authority. The court refused. The court had not found a reported case on point. It stated, "[B]ased on what I read and the fact that I found no case and there's no religious ceremony going on in this courtroom and defendant has been allowed to dress out. He's not dressed in orange, he has clothes on. I feel that's sufficient and until I am given a case otherwise, my ruling will remain as it was. He is not going to wear the collar or have a Bible."

B.     Analysis

Defendant contends the trial court unreasonably denied him his right to the "free expression of his religion" and to present himself as an ordained minister. He acknowledges a trial judge has the power and duty to regulate courtroom decorum and keep order, but he claims that duty has to be balanced against the constitutional rights of the courtroom participants, including the First Amendment right to the free exercise of religion. Defendant asserts the court erred by not appropriately weighing these competing interests. He asserts the denial of his free exercise right was structural error and is reversible per se.

Defendant has forfeited this contention. A timely and specific objection at trial is required to raise an issue on appeal, including for claims based on violations of constitutional rights. (*People v. Waidla* (2000) 22 Cal.4th 690, 726, fn. 8.) At trial, other than to state he had a right to wear a collar as an ordained minister, defendant did not specify any legal grounds for or authority in support of his request to wear a collar. On appeal, he asserts for the first time the trial court was obligated to conduct a balancing test between its interest in maintaining order and decorum and defendant's First Amendment right to the free exercise of religion. He raises various out-of-state and federal authorities to support his argument. He did not raise these arguments and authorities before the trial court, nor does he explain why he could not have made the

10

objections. He thus violated the requirement to object on specific grounds. The omission results in forfeiture of the issue. (*People v. Romero* (2008) 44 Cal.4th 386, 411.)

Were we to rule on the merits, we would conclude any error was not structural and was harmless beyond a reasonable doubt. In general, a trial court has broad power to maintain courtroom security and orderly proceedings. (*People v. Bell* (2019) 7 Cal.5th 70, 123.) Its decisions on such matters are reviewed for an abuse of discretion. (*Ibid*.)

However, the scope of the court's discretion is not unlimited. It "always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' " (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.) In this case, the laws being applied are the federal and state constitutional rights to the free exercise of religion.

The parties and we found no California cases addressing the intersection between a criminal defendant's First Amendment right to wear religious clothing in the courtroom and the trial court's authority to manage and control an orderly trial. Out-of-state courts that addressed the issue in general concluded that restrictions on wearing religious items of clothing in court were unnecessary if the trial court could mitigate any prejudicial effect. A federal district court summarized the state of the law thusly: "A number of courts have held that it is inappropriate and unnecessary to restrict a party from wearing their ordinary religious clothing during trial, when the Court can mitigate the threat of prejudice through *voir dire* and a limiting instruction. (*O'Reilly v. New York Times* [(2d Cir. 1982) 692 F.2d 863, 869-870, fn. 8] [noting that *pro se* plaintiff priest could wear his religious garb during trial]; *Ryslik v. Krass* [(N.J. App. Div. 1995) 279 N.J.Super. 293 [652 A.2d 767, 769-72]] [finding it an abuse of discretion to order a new trial based on defendant priest's having worn his roman collar during trial); see also *State v. Fergerstrom* [(Haw. Ct. App. 2004) 106 Haw. 43 [101 P.3d 652, 665]], aff'd, [(2004) 106 Haw. 41 [101 P.3d 225]] [ordering new trial where lower court prevented witness from wearing traditional religious garb during testimony]; *State v. Allen* [(Or. Ct. App.

11

1992) 113 Ore.App. 306 [832 P.2d 1248, 1249-1250]] [same]; *Close-It Enters., Inc. v. Mayer Weinberger* [(N.Y. App. Div. 2d Dept. 1978) 64 A.D.2d 686] [same].)" (*Westfahl v. Dist. of Columbia* (D.D.C. 2015) case No. 11-cv-02210 (CRC) [2015 U.S. Dist. LEXIS 197898 at *5-6] [defendant in civil rights action, a former police officer and now a minster, permitted to wear clerical collar during trial].)

Assuming only for purposes of argument that the trial court erred in not allowing defendant to wear a collar, we must determine whether the error would have been prejudicial. Federal constitutional error requires reversal unless the beneficiary of the error can show it was "harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Defendant, however, asserts the error is structural and reversible per se because it affected a fundamental constitutional right. That fact alone does not make the error structural. Structural errors are " ' "structural defects in the constitution of the trial mechanism" [that] are not amenable to harmless error analysis[.]' " (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1074.) "Structural defects requiring automatic reversal of a criminal conviction typically involve basic protections without which ' "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." ' " (*In re James F.* (2008) 42 Cal.4th 901, 914.) Structural errors include such fundamental criminal trial rights as deprivation of the right to counsel, denial of the right to trial by an impartial jury, failure to allow a party to present its entire case before the trier of fact, and improper discrimination in jury selection. (*Christopher L.*, at p. 1073.)

Facing the same issue as that before us, Minnesota state courts twice ruled that such violations of the Free Exercise Clause were not structural error. (*State v. Anderson* (Minn. Ct. App. 2015) 865 N.W.2d 712, 721-722 [denying defendant right to wear clerical collar not structural error where defendant did not show the order involved any criminal-trial rights, had any impact on the proceedings, or influenced the verdict]; *State*

*v. Tate* (Minn. Ct. App. 2004) 682 N.W.2d 169, 175 [trial court's order preventing defendant from openly wearing a cross was not structural error where the order did not affect a fundamental right guaranteed in a criminal trial].)

As in the Minnesota cases, prohibiting defendant from wearing a clerical collar did not result in a structural defect in the constitution of his trial. Nothing in the record indicates his inability to wear a collar impacted the outcome of his trial, interfered with his fundamental trial rights, or in any way impacted the trial's structural truth-finding process. Any error by the trial court in not allowing defendant to wear a collar was not structural.

We thus must determine whether the assumed error was harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. at p. 24.) Defendant offers no argument on this point. As a result, he has forfeited the issue. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Any error by the trial court denying defendant his request to wear a clerical collar was harmless beyond a reasonable doubt and not prejudicial.

III

*Prosecutorial Error*

We note here that "the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*).)

Defendant contends the prosecutor committed prejudicial misconduct by asserting in her closing argument that the emergency room physician who examined defendant after the collision testified to "a medical certainty" that defendant was under the influence when she examined him. The physician did not express that opinion. Although defense counsel objected twice and the trial court sustained both objections, counsel did not

13

request a jury admonition. Defendant argues that if counsel's omission results in a forfeiture, counsel rendered ineffective assistance by not seeking an admonition.

A.    Background

Dr. Alexis Lima was the attending emergency medical physician who examined defendant when he was brought to the hospital. The court accepted her as an expert in emergency medicine. She testified that at the hospital, defendant's heart rate was elevated and his blood pressure was on the lower end of normal, but his other vital signs were stable. The only injury identified was a laceration to the left posterior scalp.

When defendant arrived at the hospital, he was agitated. He continually tried to get out of bed. He was shouting and combative. Dr. Lima stated this type of behavior can occur because of an intercranial injury, an underlying psychiatric disorder, or substance abuse. Lima said defendant underwent a head CT which showed no acute hemorrhage or other intercranial injury, but the court sustained an objection to this testimony based on lack of foundation. Lima did not testify as to whether defendant's behavior was due to a psychiatric disorder or substance abuse. Other than the head laceration, no significant injuries were identified and no other medical findings were made regarding head trauma. Lima did not need to provide treatment for any head trauma other than the laceration. After the laceration was treated, defendant was discharged to the care of law enforcement.

During closing argument, the prosecutor reviewed with the jury the elements of the crime of gross vehicular manslaughter while intoxicated. The following colloquy occurred regarding the element of intoxication:

"[MS. SMITH (the prosecutor)]: So let's go through what the elements and the evidence are. So, remember, to gross vehicular manslaughter while intoxicated, this is Element 1. 'The defendant drove under the influence of a drug.' And what is the evidence that supports that? We have the Department of Justice analysis. There is no

14

question that there was methamphetamine and marijuana in the defendant's system. That is a fact. That is not refuted by anyone.

"You then proceed on to determine whether he was actually under the influence or not by additional factors. You have to look at the other evidence that was presented. Officer Macias, his observations, everything that happened associated with the contact of the defendant. When you watched his video with the SFST, it was very clear, visually and otherwise, that this defendant was impaired even those few hours later.

"We then have again Officer Barreto who was on the scene, but again was working in conjunction with Officer Macias, who also is talking about the behavior and demeanor of the defendant that is consistent with being under the influence. We look at, again, the body-worn camera, and also look at the video of the accident.

"You also want to look at and listen to Dr. Lima. [¶] . . . [¶] Remember what Dr. Lima said. They did a full analysis of what type of possible injuries exist and what the behaviors of this defendant showed what it could be attributed to. And at the end of the day, she crossed out any and every possible thing other than, I believe she indicated three potentials. And she, under a medical certainty, indicated that the only thing that would be left was being under the influence.

"MR. HALL: I'm going to object, facts not in evidence.

"THE COURT: Sustained.

"MS. SMITH: Dr. Lima testified. Please go back to her transcript. She testified that the only thing – there was no significant brain impairment. There was nothing else that was there. Go back to her testimony if you don't remember.

"MR. HALL: Objection; facts not in evidence.

"THE COURT: Sustained.

"MS. SMITH: Go back and look at the real evidence because it's in there, her testimony is in there."

B.    Analysis

The Attorney General contends that defendant has forfeited this claim because his trial counsel did not request a jury admonition after the trial court sustained his objections. " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*Hill, supra*, 17 Cal.4th at p. 820.)

A defendant, however, is excused from not requesting an admonition if one would have been futile, would not have cured the harm caused by the misconduct, or if the court immediately overruled a misconduct objection and consequently the defendant had no opportunity to request an admonition. (*Hill, supra*, 17 Cal.4th at p. 820.)

Defendant acknowledges that counsel did not request an admonition. But he argues he has not forfeited the claim because an admonition would not have cured the harm done by the prosecutor's comments. The prosecutor's incorrect description of Dr. Lima's expert testimony risked confusing the jury and causing them to remember Lima's testimony incorrectly.

We conclude an admonition would have cured any harm done. It would have eliminated the very risk defendant fears occurred. It would have informed jurors that the prosecution's incorrect summary of the facts was not to be considered. They then would have focused on Dr. Lima's actual testimony, which did not include an assertion to a medical certainty that defendant was under the influence. Defendant has thus forfeited this claim.

Assuming for purposes of argument the prosecutor's statements constituted error, we address defendant's contention that his counsel rendered ineffective assistance by not requesting an admonition. To establish a claim of ineffective assistance, defendant must show, " 'first, that counsel's performance was deficient because it "fell below an

16

objective standard of reasonableness . . under prevailing professional norms."
[Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's
performance fell within the wide range of professional competence and that counsel's
actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If
the record "sheds no light on why counsel acted or failed to act in the manner
challenged," an appellate claim of ineffective assistance of counsel must be rejected
"unless counsel was asked for an explanation and failed to provide one, or unless there
simply could be no satisfactory explanation." [Citations.] If a defendant meets the
burden of establishing that counsel's performance was deficient, he or she also must show
that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but
for counsel's unprofessional errors, the result of the proceeding would have been
different." ' " (*People v. Bell, supra*, 7 Cal.5th at p. 125; see *Strickland v. Washington*
(1984) 466 U.S. 668, 687-688, 694.)

We turn to the prejudice element of the analysis. We need not decide whether
counsel was incompetent if we find no prejudice. (See *In re Scott* (2003) 29 Cal.4th 783,
825.) After reviewing the evidence in the record, we conclude there is not a reasonable
probability that, had counsel requested an admonition regarding the prosecutor's
misstatement, the result of the trial would have been different. The evidence of
intoxication was too strong for an admonition to have changed the jury's opinion.

Defendant's blood test disclosed the presence of methamphetamine, amphetamine,
and marijuana in his blood stream. The test results do not equate with impairment.
Officer Macias did not smell an odor of alcohol emitting from defendant, nor did he smell
marijuana when he opened defendant's car door. He saw no drugs or drug paraphernalia
in the car. Officer Baretto also smelled no odor that would be consistent with a substance
or alcohol. But other evidence of impairment existed in addition to the blood test results.

Defendant's behavior at the scene of the collision demonstrated impairment.
Shortly after the crash, defendant walked to the victim who was incapacitated on the

17

ground, picked up a branch, and while swinging it around said, "That motherfucker better not come near me." Then he returned to his vehicle.

Defendant's interactions with Officers Macias and Barreto were suspect. After activating his body camera, Officer Macias tried to contact defendant. The footage from his camera was shown to the jury. Defendant was inside his car moving behind the window. He was trying to wave Macias away and get him to leave. He was moving his arms around quickly inside the car.

Officer Macias drew his service pistol and called Officer Barreto over. Macias was concerned about defendant's actions, and he did not want to deal with it alone. Defendant's actions were not consistent with someone who had been in an accident without something else going on. Macias believed, based on his training and experience, that it could be dangerous for an officer to go up to a vehicle with dark tinted windows such as defendant's while a person was inside moving around.

Officer Macias opened defendant's car door, but defendant resisted. Macias instructed defendant to leave the vehicle. Defendant responded incoherently and did not comply. He moved his hand up and down with a white object in his hand, like he was wiping. He reached behind the airbag and underneath the seat. Fearing defendant might be reaching for a weapon, Macias ordered defendant to show his hands. Defendant initially did not respond. Then he stuck his arms out. Macias grabbed defendant's left wrist, removed him from the car, and, with Barreto's assistance, put him on the ground. (Barreto's body camera footage was also shown to the jury.) Defendant refused to follow orders to put his hands behind his back. Macias physically placed defendant's hands behind his back, and the officers handcuffed him.

Officer Macias asked defendant whether someone else was in the vehicle and if anyone else needed medical attention. Defendant responded, but his responses had nothing to do with the questions being asked. Macias was concerned that defendant might be under the influence, based on his observations of defendant and the way he was

18

not complying with Macias's commands. Macias chose not to subject defendant to any field sobriety tests at that time due to the chance defendant might have injured his legs or hips in a way that would prevent him from successfully completing the tests.

As Officer Macias turned to answer a question from an emergency responder, defendant tried to get his feet out from under himself or wiggle away in some fashion. Macias and Barreto immediately pinned defendant back to the ground and prevented him from moving.

At one point, defendant went limp and stopped responding to the officers' commands. Officers Macias and Barreto rolled defendant into a recovery position, and Macias rubbed defendant's sternum with his knuckles. That got a response. Once he came back to, defendant rambled and muttered something Macias could not understand. Macias tried to get defendant to clarify, but he gave up upon realizing he was not getting anywhere with his questions. At the scene, Macias never got an appropriate response from defendant to his questions. Defendant rambled indiscriminately about ranking sodas, being a preacher, and shoes he bought for his son. As medical personnel were securing defendant, he was talking rapidly without being asked a question.

Defendant's behavior at the hospital also demonstrated impairment. At the hospital, defendant was agitated. He continually tried to get out of bed. He was shouting and combative. Dr. Lima stated this type of behavior could have occurred, among other possibilities, due to substance abuse.

At the hospital, Officer Macias performed a horizontal gaze Nystagmus field sobriety test on defendant. The person is asked to stand still and, with his head straight forward, follow an object with only his eyes. Macias looks to see if the pupils track evenly, if they are of equal size, and if there is involuntary bouncing of the eyes (Nystagmus) at their maximum deviation to one side or the other. He also looks to see whether the Nystagmus sets in prior to 45 degrees.

19

Defendant's pupils were very constricted, like pinpoints, which is not normal.  He also turned his entire head and neck left and right to follow the pen even though he had been asked to keep his head straight and use just his eyes.  There was also Nystagmus in both eyes despite him turning his head.  The pupil size and the Nystagmus were indications of intoxication.

In summary, the presence of drugs in defendant's blood stream, his poor performance on the horizontal gaze Nystagmus test, and his irrational behavior, incoherent speech, and inability to communicate effectively and comply with commands at the crime scene and at the hospital were more than sufficient evidence for the jury to conclude defendant was intoxicated at the time of the collision.  It is thus not reasonably probable that defendant would have obtained a more favorable result had defense counsel requested the court to admonish the jury to disregard the prosecutor's incorrect recollection of Dr. Lima's testimony.

IV

*Three Strikes Sentence*

Under the Three Strikes sentencing law, in most cases a life sentence will not be imposed for a third strike unless the new felony offense is either violent or serious. (§§ 667, subd. (e)(2)(C); 1170.12, subd. (c)(2)(C).)  Gross vehicular manslaughter while intoxicated, which is proscribed by section 191.5, subdivision (a), is not a violent felony for purposes of Three Strikes.  (§§ 1170.12, subd. (b)(1); 667.5, subd. (c).)  It also is not a serious felony for purposes of Three Strikes unless the prosecution pleads and proves that the defendant in committing the offense either personally inflicted great bodily injury on any person other than an accomplice or personally used a dangerous or deadly weapon. (§§ 1192.8, subd. (a); 1192.7, subd. (c)(8), (23).)

In charging defendant with a violation of section 191.5, subdivision (a) (count 1), the information alleged that defendant had previously been convicted of two serious

20

felony offenses for purposes of the Three Strikes law.  However, the information did not allege that count 1 was a serious felony for purposes of Three Strikes as an offense the defendant committed either by personally inflicting great bodily injury or by personally using a dangerous or deadly weapon.

Defendant contends the trial court erred in imposing a Three Strikes sentence on count 1.  He argues the information did not allege and the jury did not find true that as part of committing vehicular manslaughter while intoxicated in violation of section 191.5, he personally inflicted great bodily injury in committing the offense.

The Attorney General concedes the prosecution did not plead and the jury did not find that defendant personally inflicted great bodily injury when he committed count 1. But the Attorney General argues the jury, by finding defendant guilty on count 1, necessarily determined that defendant personally used his vehicle as a deadly weapon to commit the crime, a separate ground by which a violation of section 191.5 may become a serious felony for purposes of Three Strikes.  That ground, however, was also not separately pleaded in the information.

"A defendant has a due process right to fair notice of any sentencing allegation that, if proven, will increase the punishment for a crime."  (*In re Vaquera* (2024) 15 Cal.5th 706, 717 (*Vaquera*).)  "In the sentencing enhancement context, the touchstone of fair notice is whether the accusatory pleading enables the defense to predict the sentence the defendant faces if convicted.  To enable a defendant to make this prediction, an accusatory pleading must provide the defendant with fair notice of the factual basis on which the prosecution is seeking an increased punishment and of 'the potential sentence.' [Citation.]

"When the prosecution has not alleged a particular sentencing enhancement in connection with a specific count, a 'defendant is ordinarily entitled to assume the prosecution made a discretionary choice not to pursue the enhancement . . . and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial.'

21

[Citation.] Since an accusatory pleading that fails to inform the defendant that the prosecution is pursuing a particular sentencing enhancement in connection with a specific count does not allow the defendant to predict the potential sentence, such a pleading does not provide fair notice." (*Vaquera, supra*, 15 Cal.5th at pp. 717-718.)

*Vaquera* concerned the sufficiency of an information's One Strike allegation under section 667.61. (*Vaquera, supra*, 15 Cal.5th at p. 712.) But because the case was decided under the rubric of due process, we conclude its ruling applies equally here where the prosecution seeks an enhanced sentence beyond the sentence statutorily imposed for the offense. (*Id*. at p. 718.)

The *Vaquera* court held that "to satisfy due process, an accusatory pleading must inform the defendant that the prosecution is relying on specific facts to support imposition of a particular One Strike sentence." (*Vaquera, supra*, 15 Cal.5th at p. 719.) Due process "does not require 'rigid code pleading or the incantation of magic words.' [Citation.] An accusatory pleading need not specify the number of the pertinent sentencing statute, so long as it otherwise clearly notifies the accused of the factual basis on which it is seeking a longer sentence and the information necessary to calculate sentencing exposure." (*Id*. at pp. 719-720.)

A One Strike allegation conveys adequate notice by including a reference to the description of the qualifying factual circumstance accompanied by either a general reference to the One Strike statute or a more specific reference to the relevant subdivision of the statute. (*Vaquera, supra*, 15 Cal.5th at p. 720.) If the One Strike allegation describes the specific factual circumstance based on which the prosecution seeks a One Strike sentence and cites to the One Strike statute (§ 667.61), the allegation does not need to specify the exact sentence or cite to the specific subdivision of the One Strike statute that provides the sentence. (*Ibid*.)

Similarly, the One Strike allegation need not specify the factual basis for the sought-for sentence if the allegation's text "makes clear that the prosecution intends to

rely on the facts alleged in connection with the underlying count to seek imposition of a specific One Strike sentence on that count." (*Vaquera, supra*, 15 Cal.5th at p. 720.) "To satisfy due process, it is sufficient for an accusatory pleading to provide the defendant fair notice of the particular One Strike sentence the prosecution is seeking and of which facts it intends to prove to support that sentence." (*Ibid.*)

Because the offense of gross vehicular manslaughter while intoxicated under section 191.5 is not a serious offense for purposes of Three Strikes, under the rule of *Vaquera*, to provide fair notice that the prosecution is seeking a Three Strikes sentence, the information's Three Strikes allegation must allege either the qualifying factual circumstance—defendant personally inflicted great bodily injury on any person other than an accomplice or personally used a dangerous or deadly weapon—accompanied by a general reference to the applicable Three Strikes statutes, or that the prosecution intends to rely on the facts alleged in connection with the section 191.5 count that qualify it for a specific Three Strikes sentence also set forth in the information.

The information here did neither. Nothing in the information notified defendant that the prosecution was seeking a third strike sentence on count 1 based on the factual circumstance that defendant personally inflicted great bodily injury on the victim or personally used a dangerous or deadly weapon to commit the offense. Nor did the information allege the prosecution intended to rely on the facts alleged in count 1 to qualify defendant for a specific Three Strikes sentence. The information thus did not provide defendant with fair notice of his possible third strike sentence as required by his due process guarantee.

At oral argument and in his respondent's brief, the Attorney General contended that any inadequacy in the information was harmless beyond a reasonable doubt because defendant had actual notice of his potential third strike sentence. The Attorney General acknowledges the information did not include a Three Strikes allegation for count 1 or expressly allege that defendant's personal use of a deadly or dangerous weapon was the

basis for a third strike sentence on count 1. The Attorney General nonetheless claims that all parties, including defendant, knew from the beginning of the case that defendant was facing a third strike sentence, and any pleading error was thus harmless.

Applying a prejudice analysis as was done in *Vaquera*, we conclude the error was not harmless. Because the information can be read as indicating the prosecution elected not to seek a third strike sentence on count 1, the burden is on the Attorney General to establish that defendant "was aware of the sentence the prosecution was seeking at a time when he could have taken his sentencing exposure into consideration in making key decisions about how to conduct his defense, 'including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial.' " (*Vaquera, supra*, 15 Cal.5th at p. 727.) This is "a different case" if the prosecution provided defendant "timely actual notice that it was seeking a 25-year-to-life sentence on count [1] and the factual basis on which it was seeking that sentence, despite its failure to provide such notice in the information." (*Ibid*.)

The Attorney General contends defendant received timely and actual notice that the prosecutor was seeking a third strike sentence on count 1 based on defendant's personal use of a dangerous weapon from the following facts: The information indicated in the caption that this was a "3rd Strike Case." Count 1 alleged that defendant killed the victim while intoxicated by driving a vehicle in an unlawful manner and with gross negligence. Count 1 also alleged that defendant had two prior strike convictions. The Attorney General argues that by alleging defendant killed the victim by driving a car with gross negligence, and by the jury finding that to be true, count 1 sufficiently pleaded that defendant killed the victim by personally using a dangerous or deadly weapon, the factual basis for the third strike sentence.

The Attorney General also asserts that count 2's Three Strikes allegation is relevant. Count 2 was a lesser included offense of count 1, and it would not make sense

24

to have a lesser included offense have a higher sentencing exposure than the primary charged offense.

At certain times, the trial court informed the defendant of his potential sentence. At the preliminary hearing and justifying why it raised defendant's bail, the court stated the potential sentence was "presumptive state prison and he's looking at 25 years to life just on Count One." At the bifurcated hearing on defendant's strike priors and when asking if defendant waived his right to a jury trial, the court informed defendant that where two prior strikes were alleged, the sentence "could be two times the penalty imposed or up to a life term, depending on the nature of the prior convictions and your criminal history." At sentencing and before hearing a *Romero* motion, the court indicated its tentative sentence was to impose a term of 25 years to life. (The Attorney General argues the *Romero* motion itself indicates defendant was aware of his exposure to a third strike sentence.) And later at a post-sentencing hearing to correct the number of credits awarded, the court stated that the "191.5(a) . . . is a serious felony, not a violent felony. It is still a strike under the three strikes law . . . .

The Attorney General also argues that defendant had an opportunity to defend against the proposed third strike sentence. The instructions on count 1 required the prosecution to prove that defendant drove his vehicle in violation of traffic infractions in a way that created a high risk of death or great bodily injury (gross negligence), and that his gross negligence caused the victim's death. Defendant defended against those charges, arguing in closing argument that he did not personally use the vehicle or act with gross negligence.

From this evidence, the Attorney General concludes that defendant had actual notice of his potential third strike sentence and the factual basis for the sentence. Because all parties understood this was a third strike case, that defendant faced a prison term of 25 years to life, that defendant had an opportunity to defend against the factual elements of count 1 necessary to make it a strike, and that the prosecution did not plead

25

or prove that defendant in committing the offense personally inflicted great bodily injury, defendant by process of elimination had actual notice that the prosecution was relying on the only other available factual basis for the sentence—the personal use of a deadly weapon—as the factual basis for count 1 qualifying as a serious felony and for seeking the third strike sentence. (§§ 1192.8, subd. (a); 1192.7, subd. (c)(23.)

The Attorney General has not established that defendant had actual notice of the factual basis the prosecution was relying on to obtain a third strike sentence on count 1. His contention that defendant should have been able to determine the factual basis for a third strike sentence by the process of elimination does not satisfy the due process guarantee. It is not actual notice. "[T]o satisfy due process, an accusatory pleading [or whatever form of actual notice was given] must inform the defendant that the prosecution is relying on specific facts to support imposition of a particular [Three] Strike sentence." (*Vaquera, supra*, 15 Cal.5th at p. 719.)

Defendant knew he was facing a possible third strike sentence. The information's caption stated the case was a "3rd Strike Case," and the trial court stated at the preliminary hearing that defendant was facing 25 years to life on count 1. But this evidence did not notify defendant that the factual basis for a third strike sentence on count 1 was his using a deadly and dangerous weapon.

Simply alleging facts as part of the underlying offense and generally apprising the defendant of the potential for an enhanced penalty does not satisfy due process. To be sure, defendant's conviction of vehicular manslaughter while intoxicated as pleaded would have made it difficult to meaningfully contest the truth of the personal use of a deadly weapon circumstance had the prosecution alleged it. But, as the California Supreme Court held in *Vaquera* regarding the One Strike statute, it would be inconsistent with due process to base a Three Strikes sentence on that circumstance where the prosecution did not plead it. (*Vaquera, supra*, 15 Cal.5th at pp. 718-719.) Defendant was entitled to a separate notice of the statutory basis for any additional sentencing exposure

26

he faced along with notice of that additional exposure. Requiring defendant to decipher the factual basis of his enhanced sentence does not give defendant actual and fair notice of his potential sentence.

In any event, the process of elimination described by the Attorney General would not have necessarily resulted in defendant understanding that a third strike sentence on count 1 was based on his use of a dangerous weapon. The other factual basis provided by statute for the sentence, personal infliction of great bodily injury, could also have been applied here. Because neither ground was alleged or communicated to defendant as the basis for a third strike sentence on count 1, defendant did not receive actual notice that personal use of a deadly weapon was the factual basis for a third strike sentence on count 1.

In addition, the evidence the Attorney General relies on as evidence of notice is not unequivocal. Although the information's caption stated the case was a "3rd Strike Case," defendant could have reasonably concluded it was count 2 that rendered the case a third strike case because that was the only count that expressly alleged exposure to a third strike sentence. And count 1's pleading two strike priors did not provide actual notice. Neither of those allegations informed defendant of the factual basis on which any third strike sentence might be based.

The jury instructions also did not provide sufficient actual notice. Although the trial court instructed on the elements of the count 1 offense and defendant was able to defend against those elements, the court did not instruct the jury to determine whether defendant committed vehicular manslaughter by either personally inflicting great bodily injury or personally using a dangerous or deadly weapon. And the jury made no such finding.

Additionally, the trial court's comments on defendant's sentence at the preliminary hearing, after jury trial at the bifurcated trial on his strike priors, at sentencing, and at a post-sentencing hearing did not state the factual basis for a third strike sentence. And all

27

but the preliminary hearing comment were too late to provide defendant actual notice anyway. By those times, it was too late for defendant to take his sentence exposure into consideration in making key decisions about how to conduct his defense, such as how to plead, how to allocate investigatory resources, and what strategy to use at trial. (*Vaquera, supra*, 15 Cal.5th at p. 727.)

Had the prosecution intended to rely upon the factual allegations of count 1 as the factual basis for a third strike sentence, it needed to expressly say so in the information. It did not, and no other evidence in the record demonstrates defendant received actual notice of the factual basis for a third strike sentence on count 1. As a result, defendant was denied his due process right to fair notice of the sentence against him. We will remand for a full resentencing.

Because we conclude defendant did not receive fair notice, we need not address the Attorney General's argument that the jury, by finding defendant guilty on count 1, necessarily found that defendant personally used a deadly weapon in committing the offense.

V

*Motion to Strike Serious Felony Priors*

At sentencing, the trial court denied defendant's *Romero* motion to strike his prior serious felony convictions pursuant to section 1385, subdivision (c). Senate Bill No. 81 (2021-2022 Reg. Sess. (Senate Bill 81)) significantly revised section 1385, subdivision (c) generally to require a trial court to dismiss an enhancement when it is in the furtherance of justice to do so and in accordance with the statute's terms. (Stats. 2021, ch. 721, § 1.) Defendant contends his strike priors constitute enhancements for purposes of Senate Bill 81, and the trial court erred by not dismissing them.

Defendant acknowledges that a panel of this court rejected his argument in *People v. Burke* (2023) 89 Cal.App.5th 237 (*Burke*). In that case, we held that the Three Strikes

28

law is an alternative sentencing scheme, not an enhancement governed by section 1385, subdivision (c), and thus Senate Bill 81 did not apply to a trial court's determination of whether to strike a strike.  (*Id*. at pp. 242-244.)  Defendant asserts that *Burke* was wrongly decided, and he asks us to reconsider that ruling.

We deny the request.  We continue to hold that *Burke* was correctly decided.  There is no split of authority on this issue among the other districts of the Court of Appeal post *Burke*.  (See *People v. McDowell* (2024) 99 Cal.App.5th 1147, 1154-1156; *People v. Dain* (2024) 99 Cal.App.5th 399, 410-411, review granted May 29, 2024, S283924; *People v. Olay* (2023) 98 Cal.App.5th 60, 67-69.)  The trial court correctly determined under *Burke* that defendant's prior strikes were not enhancements subject to Senate Bill 81.

VI

*Offsetting Restitution Award with Insurance Payments*

At sentencing, the trial court noted on the record that it and counsel had discussed off the record the use of insurance to pay restitution costs.  The court informed counsel that whether a person had insurance to cover those costs was not an issue at sentencing.  The court would order restitution, and if some insurance was available to cover those costs, "that happens later."  The court ordered defendant to pay restitution for the cost of the victim's funeral in the amount of $10,066.09.

Defendant contends the trial court erred to the extent it did not consider the effect of insurance in offsetting the restitution fine and by deeming insurance payments irrelevant.  He asks us to remand and order the court to determine the ultimate restitution amount after consideration of insurance payments.

The defendant's restitution obligation is the full amount of the victim's economic losses.  (§ 1202.4, subd. (f)(3).)  The trial court did not abuse its discretion by ordering

defendant at sentencing to pay the full amount of restitution before considering whether any offsets may apply.

A criminal defendant ordered to pay restitution may be entitled to an offset for sums paid by his insurance carrier to settle a civil claim brought by the victim "to the extent that those payments are for items of loss included in the restitution order." (*People v. Bernal* (2002) 101 Cal.App.4th 155, 168; but see Ins. Code, § 533.5, sub. (a) [no policy of insurance shall provide any coverage or indemnity for the payment of restitution in any criminal action].) The party seeking an offset for restitution sums paid by insurance bears the burden of proving each fact which is essential for his asserted claim for relief. (*People v. Vasquez* (2010) 190 Cal.App.4th 1126, 1137.)

Because the trial court deferred any hearing on whether any insurance proceeds could be applied to the restitution order, defendant at resentencing may seek a hearing to establish whether he is entitled to an offset for the payment of restitution costs due to payments made by his insurance carrier to those who incurred the costs.

## DISPOSITION

The matter is remanded with directions to conduct a full resentencing in accordance with this opinion. In all other respects, the judgment is affirmed. Following

resentencing, the trial court clerk is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

                                        _____

                                          HULL, Acting P. J.

We concur:

_____

FEINBERG, J.

_____

WISEMAN, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.